1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  | Hilary K. Cox,                          )   CIV 09-8177-PCT-MHB
   |                                         )
10 |           Plaintiff,                    )   **ORDER**
   |                                         )
11 | vs.                                     )
   |                                         )
12 | Michael J. Astrue, Commissioner of the )
   | Social Security Administration,         )
13 |                                         )
   |           Defendant.                    )
14 |_____)

15         Pending before the Court is Plaintiff Hilary K. Cox's appeal from the Social Security

16 Administration's final decision to deny her claim for disability insurance benefits.  After

17 reviewing the administrative record and the arguments of the parties, the Court now issues

18 the following ruling.

19                          **I.  PROCEDURAL HISTORY**

20         Plaintiff filed an application for disability insurance benefits pursuant to Title II of the

21 Social Security Act on April 6, 2004.  (Transcript of Administrative Record ("Tr.") at 101-

22 03.)  She alleged disability since July 30, 2002, (Tr. at 101, 622), due to migraine headaches,

23 fibromyalgia, chronic fatigue, depression, anxiety, residual pain from back surgery to correct

24 scoliosis` (Tr. at 112-21, 162-69), and numbness in her hands and fingers (Tr. at 176).  Her

25 application was denied initially and on reconsideration.  (Tr. at 60-61, 80-82, 84-88.)  On

26 February 11, 2005, she requested a hearing before an Administrative Law Judge ("ALJ").

27 (Tr. at 79.)  A hearing was held on February 13, 2007, (Tr. at 542-83), followed by a

28 supplemental hearing on February 20, 2007 (Tr. at 584-617).  On March 22, 2007, an ALJ

1   issued a decision in which he found that Plaintiff was not disabled. (Tr. at 62-76.) Plaintiff

2   requested review of the ALJ's decision. (Tr. at 89.) The Appeals Council granted Plaintiff's

3   request and remanded the ALJ's decision for further administrative proceedings. (Tr. at 97-

4   100.) Specifically, the Appeals Council ordered that the ALJ give further consideration to

5   Plaintiff's residual functional capacity during the period at issue and obtain supplemental

6   evidence from a vocational expert to clarify the effect of her limitations on her occupational

7   base. (Tr. at 97-100.)

8        On September 12, 2008, another hearing was held at which Plaintiff, her attorney, and

9   a vocational expert were present. (Tr. at 618-60.) On December 18, 2008, an ALJ issued a

10  decision in which he found that Plaintiff was not disabled. (Tr. at 20-32.) Plaintiff requested

11  review of the ALJ's decision. (Tr. at 18.) The Appeals Council denied Plaintiff's request,

12  (Tr. at 9-12), thereby rendering the ALJ's decision the final decision of the Commissioner.

13  Plaintiff sought judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

14                          **II.  STANDARD OF REVIEW**

15       The Court must affirm the ALJ's findings if the findings are supported by substantial

16  evidence and are free from reversible legal error. See Reddick v. Chater, 157 F.3d 715, 720

17  (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence

18  means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might

19  accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401

20  (1971); see Reddick, 157 F.3d at 720.

21       In determining whether substantial evidence supports a decision, the Court considers

22  the administrative record as a whole, weighing both the evidence that supports and the

23  evidence that detracts from the ALJ's conclusion. See Reddick, 157 F.3d at 720. "The ALJ

24  is responsible for determining credibility, resolving conflicts in medical testimony, and for

25  resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see

26  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). "If the evidence can reasonably

27  support either affirming or reversing the [Commissioner's] conclusion, the court may not

28  substitute its judgment for that of the [Commissioner]." Reddick, 157 F.3d at 720-21.

- 2 -

1

**III.  THE ALJ'S FINDINGS**

2     In order to be eligible for disability or social security benefits, a claimant must

3  demonstrate an "inability to engage in any substantial gainful activity by reason of any

4  medically determinable physical or mental impairment which can be expected to result in

5  death or which has lasted or can be expected to last for a continuous period of not less than

6  12 months."  42 U.S.C. § 423(d)(1)(A).  An ALJ determines a claimant's eligibility for

7  benefits by following a five-step sequential evaluation:

8         (1)  determine whether the applicant is engaged in "substantial gainful
         activity";
9
          (2)  determine whether the applicant has a medically severe impairment or
10        combination of impairments;

11        (3) determine whether the applicant's impairment equals one of a number of
         listed impairments that the Commissioner acknowledges as so severe as to
12        preclude the applicant from engaging in substantial gainful activity;

13        (4) if the applicant's impairment does not equal one of the listed impairments,
         determine whether the applicant is capable of performing his or her past
14        relevant work;

15        (5) if the applicant is not capable of performing his or her past relevant work,
         determine whether the applicant is able to perform other work in the national
16        economy in view of his age, education, and work experience.

17  See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. § 404.1520).  At the

18  fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can

19  perform other substantial gainful work.  See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir.

20  1993).

21     At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

22  activity since July 30, 2002, her alleged onset date.  (Tr. at 25.)  At step two, he found that

23  Plaintiff had thoracic spinal scoliosis, lumbar scoliosis, fibromyalgia, migraine headaches,

24  syncope, pain, depression, and anxiety, impairments that were "severe" within the meaning

25  of the regulations.  (Tr. at 25.)  At step three, the ALJ stated that Plaintiff did not have an

26  impairment or combination of impairments that met or medically equaled an impairment

27  listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Commissioner's regulations.  (Tr.

28  at 25-26.)  The ALJ found that Plaintiff retained the residual functional capacity to perform

- 3 -

1 unskilled light and sedentary exertional work that allowed for a sit/stand option and did not

2 require crawling, crouching, climbing, squatting, kneeling, use of her lower extremities for

3 pushing or pulling, or use of her upper extremities for work above shoulder level.[1] (Tr. at

4 26-30.) The ALJ determined that Plaintiff's subjective complaints regarding the severity of

5 her symptoms were not fully credible. (Tr. at 30.) At step four, the ALJ found that, with her

6 residual functional capacity, Plaintiff was unable to perform any of her past relevant work.

7 (Tr. at 30-31.) At step five, based on vocational expert testimony, the ALJ concluded that

8 Plaintiff could perform a significant number of other jobs in the national economy, including

9 the unskilled light and sedentary jobs of office helper, telemarketer, and cashier. (Tr. at 31-

10 32.) Therefore, the ALJ decided that Plaintiff was not disabled.

## IV.  DISCUSSION

12 In her brief, Plaintiff contends that the ALJ erred by:  (1) rejecting of the assessment

13 of the agency's examining physician, Nathan Magaret, M.D., who found that Plaintiff

14 suffered debilitating migraine headaches approximately twice a week, requiring three hours

15 of rest and lying in bed after Imitrex injections, when the vocational expert testified a person

16 so limited would be unable to sustain work; and (2) rejecting Plaintiff's symptom testimony

17 in the absence of clear and convincing reasons for doing so, when the vocational expert

18 testified the limitations in Plaintiff's symptom testimony precluded the ability to work.

19 Plaintiff requests that the Court remand for determination of disability benefits or, in the

20 alternative, remand for further administrative proceedings.

21 As to Plaintiff's first argument that the ALJ erred by rejecting of the assessment of

22 the agency's examining physician, Nathan Magaret, M.D., an ALJ may reject an examining

23 or treating physician's opinion when it is inconsistent with the opinions of other treating or

24 examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons

25 for doing so that are based on substantial evidence in the record." Thomas v. Barnhart, 278

26

27 [1] "Residual functional capacity" is defined as the most a claimant can do after
considering the effects of physical and/or mental limitations that affect the ability to perform
28 work-related tasks.

1    F.3d 947, 957 (9th Cir. 2002) (quoting Magallanes, 881 F.2d at 751).  When the medical

2    opinion of an examining or treating physician is uncontroverted, however, the ALJ must give

3    "clear and convincing reasons" for rejecting it.  See Thomas, 278 F.3d at 957; see also Lester

4    v. Chater, 81 F.3d 821, 830-32 (9th Cir. 1995).

5            On November 19, 2004, Nathan Magaret, M.D., examined Plaintiff at the request of

6    the Commissioner.  (Tr. at 262.)  Plaintiff complained of back pain, migraine headaches,

7    depression, and panic attacks.  (Tr. at 262.)  She also complained of significant ongoing

8    thoracic and lower back pain as well as upper and cervical spine pain and bilateral shoulder

9    pain radiating into her arms.  (Tr. at 262.)  Plaintiff reported a traffic accident in 2001 where

10   she was rear-ended and complained of spasms in her upper back and arms.  (Tr. at 262.)  She

11   reported a history of migraine headaches occurring approximately two times per week that

12   have "been quite debilitating."  (Tr. at 263.)  Dr. Magaret noted that Plaintiff took Imitrex

13   injections, which greatly improved her symptoms, but required "three hours of rest and lying

14   in bed afterwards."  (Tr. at 263.)  Plaintiff complained of depression, panic attacks, and

15   anxiety, and indicated that she said she saw a psychiatrist and took medications, which were

16   "helping quite a bit over the previous six months."  (Tr. at 263.)  She reported spending a lot

17   of time lying in bed or on the couch secondary to chronic back, hip, shoulder, and arm pain.

18   (Tr. at 263.)  Plaintiff reported walking one mile on her treadmill four days per week, and

19   doing laundry with difficulty.  (Tr. at 263.)  She stated that she could not cook for prolonged

20   periods and was limited in her social activities.  (Tr. at 263.)

21           Having examined Plaintiff, Dr. Magaret found that she walked without difficulty, and

22   had no problems sitting down or standing.  (Tr. at 264.)  She had no problems taking off her

23   shoes, and completed all aspects of her physical examination without experiencing

24   significant difficulty or labored behavior.  (Tr. at 264.)  She walked without any gait

25   abnormalities and walked on her tiptoes and heels without difficulty.  (Tr. at 264.)  She

26   performed tandem gait without difficulty and did not require any assistive devices.  (Tr. at

27   264.)  She had decreased range of motion in her back, but full range of motion in her neck.

28   (Tr. at 264-65.)  She had negative straight leg raising tests.  (Tr. at 265.)  She had some mild

1   soft tissue tenderness to palpation over her bilateral cervical spine paraspinous muscles and

2   some mild pressure point tenderness over her trapezius muscles bilaterally.  (Tr. at 265.)

3   Additionally, she had an element of scoliosis with left-sided concavity. (Tr. at 265.) She had

4   normal 5/5 muscle strength throughout her upper extremities, and had normal muscle bulk

5   and tone.  (Tr. at 265.)  Her hand grip strength was normal bilaterally, and had normal 5/5

6   strength throughout her lower extremities bilaterally. (Tr. at 265.) She had normal sensation

7   and reflexes.  (Tr. at 266.)

8           Dr. Magaret subsequently diagnosed Plaintiff with chronic thoracic spine back pain

9   secondary to scoliosis, scoliosis post-Harrington rod placement, bilateral shoulder pain with

10  radiation into her upper extremities, recurrent migraine headaches, and depression/anxiety

11  attacks. (Tr. at 266.) He suggested that she could walk for at least six hours in an eight-hour

12  day with the only restrictions being breaks every two hours.  (Tr. at 266.)  He stated she

13  could sit for six hours as well with frequent breaks at least every two hours to prevent

14  stiffness.  (Tr. at 266.)  She could carry up to 25 pounds occasionally and ten pounds

15  frequently. (Tr. at 266.) She could not do frequent bending, stooping, or crouching, but has

16  no manipulative limitations. (Tr. at 266.) Dr. Magaret ultimately concluded that Plaintiff's

17  "relevant visual, communicative, or workplace environmental limitations would be her

18  history of chronic migraine headaches and need for occasional release from work when these

19  symptoms occur for appropriate treatment."  (Tr. at 267.)

20          Later, at the administrative hearing conducted on September 12, 2008, Plaintiff

21  testified to frequent migraine headaches that had progressed to up to four times per week,

22  (Tr. at 626), as well as effects of fibromyalgia stating, "I have [pain] ... in my neck, in my,

23  around my shoulder blades, in my hands, my feet, sometimes my legs," (Tr. at 629), and

24  "severe muscle spasms in my back from my surgery." (Tr. at 630.) Regarding the migraine

25  headaches, Plaintiff stated that she takes Imitrex, which requires that she remain still or

26  asleep for "about three or four hours," and "after about four hours, [she] can get up and move

27  around, but [she's] very worn out from them."  (Tr. at 630.)  Plaintiff indicated that

28  "[m]igraines pop up unexpectedly, and they're completely, they're debilitating.  [She has]

1   to lay down in a dark, quiet, no movement, no sound area ... ."  (Tr. at 634.)  Plaintiff testified

2   that she sleeps about four hours a day.  (Tr. at 636.)

3          During the hearing, vocational expert Mark Kelman was asked the following

4   hypothetical question from the ALJ:

5          Let's assume that we have … a person … who is able to do sedentary and light
       work.  For light work, I mean lift up to 20 pounds occasionally and up to ten
6          pounds on a more frequent basis; and for sedentary work, lift up to ten pounds
       occasionally and lesser weights on a frequent basis.  The jobs would be
7          unskilled.  ...  There would be postural limitations so there would be no
       crawling or crouching or climbing or squatting or kneeling.  There would be
8          lower extremity limitations so there would be no use of the legs or feet for
       pushing or pulling of foot or leg controls.  ...  And the job would offer a
9          sit/stand option so that the employee could alternate between sitting and
       standing and still do the job.

10
    (Tr. at 651-52.)  In response, Mr. Kelman identified jobs as office helper, telemarketer, and
11
    cashier.  (Tr. at 652-53.)  Then, however, the ALJ asked Mr. Kelman, "[n]ow if a person
12
    were going to miss work, and it would occur on a regular basis, how many days would an ...
13
    employer allow someone to be absent?"  (Tr. at 653-54.)  Mr. Kelman responded, "I believe
14
    with unskilled jobs, the expectation is very little absenteeism, but if a person were to miss
15
    one day a month, and that repeats itself in a second month, a third month, I think shortly
16
    thereafter, that person would be subject to termination.  It's just that pattern of absenteeism
17
    is not allowed in unskilled jobs."  (Tr. at 654.)
18
           In his assessment of the medical evidence at issue, the ALJ stated, in pertinent part,
19
    "[t]he undersigned has examined the medical evidence and basically accepts the findings and
20
    conclusions of a consultative examination on November 19, 2004 by Nathan Magaret, M.D.,
21
    with the revisions stated above in the residual functional capacity evaluation by the
22
    undersigned."  (Tr. at 27.)  The ALJ relied on Dr. Magaret's opinion stating,
23
           the claimant should be able to walk or stand at least 6 hours in an 8-hour work
24          day, with the only restrictions being breaks every 2 hours, based on her back
       pain and scoliosis. ... She could sit 6 hours with frequent breaks at least every
25          2 hours.  She could carry up to 25 pounds and frequently 10 pounds. ... The
       ability to perform sedentary and light work was this based on the scoliosis of
26          the lumbar and thoracic spine, plus fibromyalgia, migraine headaches and
       syncopal episodes, plus pain.
27

28
                                           - 7 -

1    (Tr. at 27.)  The ALJ found that "claimant's medical record was ... consistent with the

2    conclusions of Dr. Magaret that claimant could perform a wide range of sedentary and light

3    work on a sustained basis."  (Tr. at 28.)

4        However, while documenting throughout his decision from multiple sources that

5    Plaintiff has a history of migraine headaches dating back to 1995, (Tr. at 27-29), the ALJ

6    failed to properly reconcile his finding that claimant could perform a wide range work on a

7    sustained basis, with Dr. Magaret's ultimate conclusion that Plaintiff's limitation "would be

8    her history of chronic migraine headaches and need for occasional release from work when

9    these symptoms occur for appropriate treatment" (Tr. at 267).  In a conclusory fashion and

10   without any support or citations from the objective medical record, the ALJ stated,

11           The claimant did have periodic headaches.  The claimant had been treated for
             migraine headaches since 1995 and had demonstrated an ability to sustain full-
12           time work activity.  There was no indication that the claimant's migraines had
             significantly worsened in terms of severity or frequency.  The claimant's
13           migraines could be controlled with medication when she used it [].  There were
             no side-effects.
14
     (Tr. at 28-29.)  Thus, the ALJ ignored and effectively rejected Dr. Magaret's conclusion
15
     regarding the debilitating effects of Plaintiff's migraine condition as well as the effects of the
16
     medication used for treatment without providing any reasons for doing so.
17
             In response, Defendant argues that assuming Dr. Magaret assessed Plaintiff with
18
     limitations inconsistent with sustained work, the ALJ rejected any such limitations when he
19
     found that Plaintiff's subjective complaints were not credible.  Specifically, Defendant
20
     contends that Plaintiff's subjective complaints were inconsistent with the objective medical
21
     evidence, evidence of Plaintiff's activities of daily living, and Plaintiff's response of her
22
     symptoms to medications.
23
             In his assessment of Plaintiff's credibility, the ALJ stated the following, in pertinent
24
     part:
25
             [T]he undersigned finds that the claimant's medically determinable
26           impairments could reasonably be expected to cause some of the alleged
             symptoms; however, the testimony of the claimant is not fully credible
27           concerning the severity and extent of her limitations.  Neither the severity nor
             the extent is supported by the medical evidence of record.  The claimant's
28

- 8 -

1
2
3
4
5

testimony was inconsistent with the medical findings, as they indicated she had normal strength, normal range of motion of her neck and normal grip strength and muscle strength in her upper and lower extremities, as confirmed by Dr. Magaret. She had no difficulty walking one mile on a treadmill. The extensive daily activities ... are inconsistent with the claimant's allegations. The claimant takes care of her son as evidenced by her statements that she takes him to school and the[n] picks him up in the afternoon. There was no significant side-effects from medication.

(Tr. at 30.) In his Opposition to Plaintiff's Opening Brief, Defendant cites to the findings of

6
7
8
9
10
11
12
13
14

Drs. Simasko, Rozell, Melcher, Gullo, McCluskey, Ong-Veloso, Nasef, Kazmi, and Magaret

stating that Plaintiff's subjective complaints were not consistent with the degree of *physical*

symptomology and limitation that Plaintiff alleged. (Tr. at 288-89, 281, 408-10, 410-415,

401-05, 427-29, 345-57, 341-44, 444-46, 438-43, 492-95, 434-36, 262-67.) Similarly,

Defendant claims that the findings of Dr. Perry, Ms. Myers, the Mohave Mental Health

Clinic, and Mr. Alford were not consistent with the degree of *mental* symptomology and

limitation that Plaintiff alleged. (Tr. at 292-95, 291-92, 290-91, 281, 284-88, 280, 282-83,

420-23, 378-80, 364-66, 520-33, 508-11, 535, 503-04, 536, 500-01.)

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant additionally argues that evidence of Plaintiff's daily activities was not

consistent with her subjective complaints. For example, Defendant states that in January

2003, Plaintiff reported to Dr. Perry that she walked on a treadmill approximately three times

per week for 15-20 minutes, stretched, and performed band exercises. (Tr. at 292-95.) In

November 2004, she told Dr. Magaret that she walked one mile on her treadmill four days

per week, did laundry with difficulty, and cooked. (Tr. at 262-67.) In May 2008, she told

Ms. Wright that she took care of her son, dressed herself, and went to appointments. (Tr. at

471-72.) Defendant continues citing a litany of activities attempting to discredit Plaintiff's

subjective complaints: she stated that she got her son ready for school; balanced her check

book; watched television; took her dog on walks; bathed and fixed her hair; prepared simple

meals; washed/put away dishes; and did some vacuuming, laundry, and dusting. (Tr. 146-

53.) Defendant further states that Plaintiff went to doctors' appointments and church; she

drove a car and shopped for groceries once or twice a month; she took her son to school in

the morning and picked him up after school. (Tr. at 146-53, 635-36.)

1  Lastly, Defendant argues that the effectiveness of Plaintiff's medication detracted
2  from her credibility and provided further evidence demonstrating that her symptoms were
3  not so severe as to be disabling.

4  In Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986), the Ninth Circuit established two
5  requirements for a claimant to present credible symptom testimony: The claimant must
6  produce objective medical evidence of an impairment or impairments, and he must show the
7  impairment or combination of impairments could reasonably be expected to produce some
8  degree of symptom. See id. at 1407. The claimant, however, need not produce objective
9  medical evidence of the actual symptoms or their severity. See Smolen v. Chater, 80 F.3d
10  1273, 1284 (9th Cir. 1996).

11  If the claimant satisfies the above test and there is not any affirmative evidence of
12  malingering, the ALJ can reject the claimant's pain testimony only if he provides clear and
13  convincing reasons for doing so. See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007)
14  (citing Lester, 81 F.3d at 834). General assertions that the claimant's testimony is not
15  credible are insufficient. See id. The ALJ must identify "what testimony is not credible and
16  what evidence undermines the claimant's complaints." Id. (quoting Lester, 81 F.3d at 834).

17  In weighing a claimant's credibility, the ALJ may consider many factors, including,
18  "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,
19  prior inconsistent statements concerning the symptoms, and other testimony by the claimant
20  that appears less than candid; (2) unexplained or inadequately explained failure to seek
21  treatment or to follow a prescribed course of treatment; and (3) the claimant's daily
22  activities." Smolen, 80 F.3d at 1284; see Orn v. Astrue, 495 F.3d 625, 637-39 (9th Cir. 2007).
23  The ALJ also considers "the claimant's work record and observations of treating and
24  examining physicians and other third parties regarding, among other matters, the nature,
25  onset, duration, and frequency of the claimant's symptom; precipitating and aggravating
26  factors; functional restrictions caused by the symptoms; and the claimant's daily activities."
27  Smolen, 80 F.3d at 1284 (citation omitted).

28

1          The Court has considered Defendant's arguments as to Plaintiff's credibility and finds

2   Defendant's contentions unpersuasive.  As the ALJ did in his evaluation of the objective

3   medical evidence, he again misses the mark in evaluating Plaintiff's credibility and, thus,

4   fails to support his decision to discredit Plaintiff's allegations with specific, clear and

5   convincing reasons.  When attempting to refute Plaintiff's testimony with the objective

6   medical evidence, the ALJ spends the entirety of his discussion addressing the fact that

7   Plaintiff had "normal strength, normal range of motion of her neck and normal grip strength

8   and muscle strength in her upper and lower extremities," and finding that Plaintiff "had no

9   difficulty walking one mile on a treadmill" or taking "care of her son as evidenced by her

10  statements that she takes him to school and the[n] picks him up in the afternoon."  The ALJ

11  completely fails to address the fact that Plaintiff testified to having frequent migraine

12  headaches that had progressed to up to four times per week, and having to take medication

13  which requires that she remain still or asleep for "about three or four hours," and "after about

14  four hours, [she] can get up and move around, but [she's] very worn out from them."  And,

15  the long litany of normal findings set forth in Defendant's brief – facial symmetry, sensation,

16  motor strength, coordination, range of motion, gait, reflexes, cranial nerves – sheds no light

17  on the severity of Plaintiff's migraine headaches and the effects of the medication used to

18  control the condition.

19         Likewise unavailing is the ALJ's reliance on the use of Plaintiff's activities of daily

20  living to discredit her testimony.  The ALJ fails to draw a connection between reported

21  activities of daily living and the ability to sustain work considering Plaintiff's specific

22  migraine condition.  Indeed, this Circuit has made clear that the mere fact that a claimant

23  engages in normal daily activities "does not in any way detract from her credibility as to her

24  overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled."

25  Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting Fair v. Bowen, 885 F.2d

26  597, 603 (9th Cir. 1989)).  Thus, the Court finds no inconsistency between Plaintiff's reported

27  activities and her symptom testimony.  As to the alleged improvement of Plaintiff's condition

28  with treatment, Defendant fails to link any reported improvement to the ability to sustain

1   work-related activities on a regular and continuing basis – especially considering that the

2   medication used to treat Plaintiff's condition requires that she remain still or asleep for

3   "about three or four hours," and "after about four hours, [she] can get up and move around

4   ... ."

5        In summary, the ALJ failed to provide a sufficient basis to reject Dr. Magaret's

6   conclusion regarding the debilitating effects of Plaintiff's migraine condition as well as the

7   effects of the medication used for treatment, or find that Plaintiff's allegations were not

8   entirely credible.  Accordingly, the ALJ has failed to support his decision to reject Dr.

9   Magaret's opinion and discredit Plaintiff's allegations with specific, clear and convincing

10  reasons and, therefore, the Court finds error and will vacate the ALJ's decision.

11       Having decided to vacate the ALJ's decision, the Court has the discretion to remand

12  the case for further development of the record or for an award benefits.  See Reddick, 157

13  F.3d at 728.  This Circuit has held that a remand for an award of benefits is appropriate in

14  cases where there are no outstanding issues that must be resolved before a proper

15  determination can be made and where it is clear from the record that the ALJ would be

16  required to award benefits.  See, e.g., Varney v. Secretary of HHS, 859 F.2d 1396 (9th Cir.

17  1988); Smolen, 80 F.3d at 1292.  Here, as the Court has indicated, Dr. Magaret ultimately

18  concluded that Plaintiff's "limitations would be her history of chronic migraine headaches

19  and need for occasional release from work when these symptoms occur for appropriate

20  treatment." (Tr. at 267.)  Later, at the administrative hearing conducted on September 12,

21  2008, Plaintiff testified to frequent migraine headaches that had progressed to up to four

22  times per week, (Tr. at 626), and stated that she takes Imitrex, which requires that she remain

23  still or asleep for "about three or four hours," and "after about four hours, [she] can get up

24  and move around, but [she's] very worn out from them." (Tr. at 630.)  Plaintiff explained

25  that her "[m]igraines pop up unexpectedly, and they're completely, they're debilitating. [She

26  has] to lay down in a dark, quiet, no movement, no sound area ... ." (Tr. at 634.)  Plaintiff

27  testified that she sleeps about four hours a day.  (Tr. at 636.)  Further, considering these

28  limitations, Mr. Kelman stated, "I believe with unskilled jobs, the expectation is very little

1  absenteeism, but if a person were to miss one day a month, and that repeats itself in a second

2  month, a third month, I think shortly thereafter, that person would be subject to termination.

3  It's just that pattern of absenteeism is not allowed in unskilled jobs."  (Tr. at 654.)

4         Thus, because the opinion of Dr. Magaret and testimony of Plaintiff coupled with Mr.

5  Kelman's opinion establish that Plaintiff is not able to work, "a remand for further

6  proceedings would serve no useful purpose."  Reddick, 157 F.3d at 730; see Varney, 859

7  F.2d at 1401 ("[T]he vocational expert's testimony establishes that [the claimant] cannot

8  work and is entitled to disability benefits. We therefore remand for an award of such

9  benefits.").  The Court will remand for a determination of benefits.

10                                    **V.  CONCLUSION**

11         Accordingly,

12         **IT IS ORDERED** that the final decision of the Commissioner is **VACATED**, and

13  this matter is **REMANDED** to the Commissioner for a determination of benefits.  The Clerk

14  of the Court shall enter judgment accordingly.

15         DATED this 18th day of March, 2011.

16

17  _____

18                              Michelle H. Burns
                            United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

- 13 -